IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SUSAN BIBA,

        Plaintiff,

  v.

WELLS FARGO & COMPANY, a Delaware Corporation; GREATER BAY BANCORP, a California Corporation; and THE GREATER BAY BANCORP CHANGE IN CONTROL PLAN I,

        Defendant.

_____/

No. C 09-3249 MEJ

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Susan Biba filed a complaint asserting five separate causes of action and naming as Defendants Wells Fargo & Company, a Delaware Corporation; Greater Bay Bancorp, a California Corporation; and THE GREATER BAY BANCORP CHANGE IN CONTROL PLAN I, (collectively "Defendants").  (Pl.'s Compl., Dkt. #1.)  Before the Court is Defendants' Motion for Summary Judgment, or in the alternative, Partial Summary Judgment as to the remaining four causes of action in the complaint.  (Defs.' Mot., Dkt. #23.)  For the reasons set forth below, the Court GRANTS Defendants' Motion for Summary Judgment in its entirety.

## II.  BACKGROUND

**A.**    **Factual Background**

Biba began working at Greater Bay Bancorp("GBB") in June 2000 as a Senior Vice President and Regional Credit Administrator of the East Bay Market.  (Joint Statement of

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1    Undisputed Material Facts ("JSF") ¶3, Dkt. #24.)  In 2006, Biba became the Manager of GBB's

2    Special Assets Department ("SAD") in the Walnut Creek office.  *Id.* at ¶¶4, 5.  In October 2007,

3    Biba was earning a base salary at GBB of $152,980.08, plus a $750/month auto allowance.  (JSF

4    ¶17, Dkt. #24.)

5         Throughout Biba's employment with GBB, GBB had in place a "Change of Control Plan"

6    ("Plan") that governed the issuance of severance benefits to eligible GBB employees whose

7    employment was terminated in the event that GBB was acquired by another company.  (Plaintiff's

8    Separate Statement of Material Facts ("PF") ¶3, Dkt. #63.)  GBB amended the Plan on August 21,

9    2001, January 1, 2005, and June 19, 2007.  *Id.* at ¶7.  The Plan was amended a final time on

10   September 28, 2007.  *Id.* at ¶11, Ex. 1.  Among other things, the amended Plan provides that

11   eligible employees who are terminated by a "successor employer" as a result of a change in control

12   are entitled to receive a "base benefit."  *Id.*, Ex. 1, Sec. 4.1.  For employees in Biba's position, the

13   "base benefit" includes one year of pay, health benefits for one year, outplacement services, and a

14   pro-rated bonus.  *Id.* at ¶13, Ex. 1.

15        In May 2007, Wells Fargo & Company ("WFC") announced its plan to acquire GBB (this

16   transaction is hereinafter referred to as "the Merger" or "the Acquisition").  (JSF ¶8, Dkt. #24.)

17   Prior to the legal close of the Acquisition, WFC provided GBB employees with information about

18   how the Acquisition could impact their employment.  *Id.* at ¶10.  In July 2007, WFC Credit

19   Management Group ("CMG") managers Jeanette Mebane, Robert Creed, and Sid Copeland held a

20   meeting with all of the members of GBB's Special Assets Department, including Biba.  (Mebane

21   Decl. ¶¶1-4, Dkt. # 28.)  Mebane testified that the purpose of this meeting was to begin the

22   transition process for the GBB employees of the Special Assets Department that were scheduled to

23   be provided with a position at WFC after the Acquisition.  (Isom Decl., Ex. 4 (Mebane Depo.),

24   26:4-11, Dkt. # 25.)  Both Mebane and Creed testified that all eight of the SAD employees,

25   including Biba, were "mapped" to WFC's Credit Management Group.  (*Id.*; *see also* Isom Decl., Ex.

26   6 (Creed Depo.), 14:6-10, Dkt. # 25.)  Biba, however, testified in her deposition that she does not

27   recall the exact substance of this meeting.  (Lewis Decl., Ex. 1 (Biba Depo.), 34:16, Dkt. # 37.)

28

1    Nevertheless, around the time of this meeting, Biba communicated that she was not interested in a

2    position with the CMG because she felt she was overqualified and it was an "inappropriate fit" for

3    her.  (Isom Decl., Ex. 1 (Biba Depo.), 43:6-21, Dkt. # 25; Isom Decl., Ex. 4 (Mebane Depo.),

4    36:19-20, Dkt. #25.)  Accordingly, Biba undertook efforts to find a different position within WFC,

5    but those efforts proved unsuccessful. (PF ¶21, Dkt. #63.)

6            On September 21, 2007, Creed sent an email to WFC Human Resources Consultant 4,

7    Brigitte Stream, containing a list of SAD employees who were "mapped" to WFC's CMG.[1]  (Isom

8    Decl., Ex. 6, 14:6-10, Dkt. #25.)  Biba's name was included on that list along with a note stating

9    that "Susan has told us she is not interested in CMG - we will need to fill this as a LA 2/3/4)[.]"  *Id.*

10           Biba alleges that on at least two separate occasions prior to the Merger, WFC's Executive

11   Vice President, Don Fracchia, represented to GBB's Executive Vice President for Biba's division,

12   Ken Shannon, and other executives that WFC would not offer positions to GBB employees who did

13   not want to work for WFC after the Merger.  (Pl.'s Compl. ¶13, Dkt. #1.)  Consequently, by not

14   offering positions to the GBB employees, eligible employees such as Biba would be able to receive

15   benefits under the Plan.  *Id.*  Shannon subsequently represented this same information to his staff,

16   including Biba, on a number of occasions prior to the Merger.  *Id.* at ¶21.  Biba further alleges that

17   after the Merger, WFC "failed to abide by its pre-Merger promise not to offer positions to GBB

18   employees who did not want to work for WFC."  *Id.* at ¶22.

19           The Acquisition legally closed on October 10, 2007.  (JSF ¶14, Dkt. #24.)  On or about

20   November 6, 2007, Mebane met with Biba and gave her a letter concerning the status of Biba's

21   employment with WFC following the Acquisition.  *Id.* at ¶15, Ex. 2.  The relevant portions of this

22   letter read as follows:

23           I want to confirm your role following the effective date of [the Acquisition].  The
             following summarizes the position we have identified for you in Wells Fargo Bank's
24           Credit Management Group taking into consideration, your skills and experience and
             provides additional information related to your ongoing employment with Wells
25           Fargo.

26   _____

27           [1]Defendants explained that "Mapped" means that WFC was intending to "bring over to the CMG
     group after the merger" to become part of the CMG.  (Isom Decl., Ex. 6, 14:6-10, Dkt. #25.)

28                                          Page 3 of  29

United States District Court

For the Northern District of California

1             Your job title will be Loan Adjustment Manager 3 and you will be reporting to
2             myself or one of the California CMG Loan Adjustment Managers.  Your current
             location will be at 1255 Treat Blvd., Walnut Creek . . . .

3             Your annual base salary will be $148,525.20 (less applicable taxes and
4             withholdings), you will continue to be paid on Greater Bay's regularly scheduled
             scheduled paydays.  There will be no changes in your participation in Greater Bay's
5             benefit plans through the end of the year.

6             Based on your decision not to accept the position available, you will report to work
             through November 30, 2007 and then you will be in a non-working status through
7             December 31, 2007.

8   *Id.*, Ex. 2.  On November 8, 2007, WFC's Human Resources Manager, Kathy Kroll, sent Biba a

9   second letter further describing Biba's employment situation after the acquisition.  *Id.* at ¶16, Ex. 3.

10  The relevant portions of this letter read as follows:

11            I understand that you received a letter from Jeanette Mebane dated November 1,
12           2007 confirming your position of Loan Adjustment Manager 3 with Wells Fargo,  It
            is my understanding that you do not want to continue your employment with Wells
13           Fargo.  I want to take this opportunity to explain the impact of this decision so that
            you understand the situation as you consider your options.

14          [The Plan] provides severance benefits if, during the one year period following a
15          Change in Control, your employment is terminated by Wells Fargo or Wells Fargo
          does not provide you a Comparable Position.  [The Plan] defines Comparable
16         Position but it is my understanding that it generally means a position that provides
         you the same base salary rate as you had prior to the Change in Control and is based
17        in a location that does not require to increase your commute by more than 35 miles
        each way.  The Loan Adjustment 4 position described in my November 1 letter
18       meets these criteria, and [the Plan] does not give you the flexibility to decide
       whether you want to continue your employment performing the job duties of a
19     Comparable Position or terminate your employment and receive [Plan] severance
     pay and benefits.

20       The November 1 letter stated that, based on your decision not to accept the Loan
21       Adjustment Manager 3 position, you would be working through November 30, 2007
       and then you would be in a non-working status through December 31, 2007[.]  I
22     want to clarify that if you choose to voluntarily resign, we would appreciate the
     opportunity to work out a mutually agreeable departure date, but you are not
23     required to work through a specific date and you will not be in a non-working
     status[.]  And although the letter doesn't specifically mention severance benefits, I
24     want to make sure you fully understand the situation.

25  *Id.*, Ex. 3.

26          Despite this letter, Biba continued working for WFC through the October 2007 Merger until

27

28                              Page 4 of  29

United States District Court

For the Northern District of California

February 2008.  (JSF ¶29, Dkt. #24.) Although the November 1 letter references a base salary of 148,525.20, Defendants allege, and Biba does not dispute, that Biba was actually paid the same salary she earned immediately prior to the Acquisition until January 2008 when her base salary was increased to $161,980.08.  (Defs.' Reply Mot. 3:4-9, Dkt. # 64.)  On December 14, 2007, WFC's Benefits Enrollment Database identified Biba's position as Loan Adjustor 4.  (PF ¶89, Dkt. # 63.)

At all times relevant to this case, Patrick Pierce was Biba's direct supervisor throughout their employment at GBB and WFC.  (Plaintiff's Separate Statement of Material Facts ("PF") ¶3, Dkt. #63.)  On December 18, 2007, Biba and Pierce met with Fracchia to discuss why WFC was not honoring its promise to grant severance to eligible GBB employees who chose not to remain with WFC after the Merger.  (PF ¶69, Dkt. #63.)  As a result of Fracchia's conduct during that meeting, Pierce and Biba filed complaints against Fracchia with a human resources representative complaining that Fracchia had been "verbally abusive and physically confrontational" in the meeting.  *Id.* at  ¶74.

In December 2007, WFC Human Resources Specialist Rene Tassio discovered that Biba had not completed an I-9 Form or the background authorization forms.  (JSF ¶18, Dkt. #24.)  WFC employees are required to successfully complete these forms as a material condition of their employment.  *Id.* at ¶19.

In early January 2008, Biba notified GBB human resources, her WFC managers and leave department, and Pierce that she needed to take medical leave for knee surgery which was scheduled for the third week of February 2008.  *Id.* at ¶¶138, 139.  WFC

On January 24, 2008, Stream sent Biba a memorandum notifying Biba that WFC was placing her on paid administrative leave until January 28, 2008 pending her completion of the background authorization form.  *Id.* at ¶20.  On January 28, 2008, Biba faxed Stream a signed authorization form that included a number of conditions with a letter explaining her concerns about signing the authorization.  *Id.* at ¶21, Ex 5.  In an email sent on January 29, 2008, Stream informed Biba that WFC "cannot entertain the conditions to your background check authorization. . ." because "successful completion of Wells Fargo's background check process is a material condition

of your employment at Wells Fargo." *Id.* at ¶22, Ex. 6.  Nevertheless, Biba was given until January

30, 2008 to complete the authorization.  *Id.*  Biba completed the background authorization form

without conditions but "under protest" on January 30, 2008.  *Id.* at ¶23.  However, WFC did not

receive Biba's authorization by the deadline set by Stream and therefore notified Biba's managers

that WFC was going to terminate her employment.  (Isom Decl., Ex. 3, Dkt. # 25.)  Later that day,

Biba sent Stream an email indicating that she had faxed the form in a timely manner, but she faxed

it to the wrong fax number.  *Id.*  As a result, WFC stopped processing Biba's termination and

confirmed that she could return to work.  *Id.*

On February 1, 2008, the company WFC uses to conduct its background checks (USIS) sent

an email notifying WFC that it was unable to run the background check because Biba's social

security number was "frozen."  *Id.* at ¶24, Ex. 7.

Stream and Biba communicated several times over the next few days, both by phone and

email, regarding the security freeze on Biba's social security number.  (JSF ¶25, Dkt. #24.)  On

February 5, 2008, Stream emailed Biba requesting an "update to the request for allowing USIS to

complete the background check."  *Id.* at ¶26, Ex. 8.  On that same day, Biba submitted a harassment

complaint against Stream and Fracchia relating to Stream's communications with Biba concerning

the incomplete forms and Fracchia's conduct during the December 18, 2007 meeting.  *Id.* at ¶30,

Ex. 11.  On February 7, 2008, Biba sent an email to Stream notifying her that the security freeze

had been temporarily lifted for three days.  *Id.* at ¶27, Ex. 9.  Although not entirely clear why, WFC

was still unable to complete the background check because the security freeze had still not been

completely lifted.  (Isom Decl., Ex. 2 (Stream Depo. 8:18), Dkt. #25.)

On or about February 11, 2008, Mebane and Creed decided to terminate Biba's employment.

(JSF ¶28, Dkt. #24.)  On February 12, 2008, Mebane gave Biba a letter providing information

surrounding Biba's "involuntary termination."  *Id.* at ¶29, Ex. 10.  That letter reads as follows:

> This letter provides you information surrounding your involuntary termination of
> employment effective February 13, 2008.
>
> In the past few weeks, we have been trying to work with you to gather information
> necessary to continue your employment at Wells Fargo.  We recently discovered

through an audit that you had not completed a Background Check Authorization Form.  It took many phone calls and emails to obtain your authorization and our third party vendor still cannot access the necessary records to perform the background check.

Last week, we learned through a separate audit that you failed to complete another critical form, the I-9.  Completion of the I-9 is also a material term of employment at Wells Fargo.  When we researched the findings of this audit, we learned that you had told one of [GBB]'s Human Resources Consultants in mid-Decemeber that you refused to sign Wells Fargo's employment forms because you were not going to work for Wells Fargo.  Because some of these forms, such as the I-9 and the Background Check Authorization were mandatory, the Human Resources Consultant followed up with you again a few weeks later in an effort to try to collect completed forms from you.  It is my understanding that you provided a response similar to the response you gave her in December.

Susan, you were asked months ago to complete a number of employment-related forms.  You initially refused and to date many of these forms and processes remain incomplete (e.g. the background check, the I-9 Form, Team Member Acknowledgement Form, etc.).  Your failure to comply with Wells Fargo's material conditions of employment has caused us to terminate your employment.

*Id.*  Biba's termination took effect on February 13, 2008.  *Id.* at ¶29.

On December 1, 2008, Biba submitted a claim for benefits to the Plan administrator pursuant to Section 6.5(a) of the Plan.  (PF ¶41, Dkt. #63.)  WFC never responded to Biba's claim. *Id.* at ¶42.

**B.      Procedural Background**

On July 16, 2009, Biba filed the present complaint, naming as defendants WFC, GBB, and the Plan, and asserting five separate causes of action: (1) a claim for severance benefits under the Plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(1)(B), 29 U.S.C. §§ 1001, *et seq.*, § 1132(a)(1)(B); (2) a claim for equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); (3) a claim for discrimination under ERISA § 510, 29 U.S.C. §1140; (4) a claim for violation of California Labor Code § 201; and (5) a claim for interference with Biba's right to take protected medical leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(1) .  (Pl.'s Compl., Dkt. #1.)

On May 24, 2010, the parties filed a stipulated judgment with respect to Biba's claim for violation of California Labor Code § 201.  (JSF ¶32, Ex. 12, Dkt. #24.)

On May 27, 2010, Defendants filed a Motion for Summary Judgment or in the alternative,

1  Partial Motion for Summary Judgment.  (Defs. Mot., Dkt. #23.)  Also on May 27, 2010, the parties

2  filed a Joint Statement of Undisputed Material Facts.  (JSF, Dkt. #24.)

3      On June 24, 2010, Biba filed an Opposition (Pl.'s Opp'n., Dkt. #34), and a Separate

4  Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment (PF, Dkt.

5  #63).

6      On July 1, 2010, Defendants filed a Reply to Plaintiff's Opposition to Defendants' Motion

7  for Summary Judgment, or in the alternative, Partial Summary Judgment.  (Defs. Reply, Dkt. #64.)

8      On July 15, 2010, the Court held a hearing on the matter.

**III.  DISCUSSION**

10  **A.      Jurisdiction and Venue**

11      This Court's jurisdiction to review this matter arises under 29 U.S.C. § 1132(a), which

12  grants to every participant in a covered employee benefit plan a statutory right to bring a civil

13  action in federal district court to recover benefits owed under the plan.  Although ERISA does not

14  expressly require exhaustion of administrative remedies for employees seeking to recover benefits

15  under employee benefits plans, the Ninth Circuit has held, with few exceptions, that exhaustion of

16  internal administrative remedies is a prerequisite to filing suit in federal court to recover those

17  benefits.  *Amato v. Bernard*, 618 F.2d 559 (9th Cir. 1980).  In the present case, Biba's

18  administrative remedies are deemed exhausted because the Plan administrator failed to respond to

19  Biba's claim for benefits.  *Jebian v. Hewlett-Packard Co.*, 349 F.3d 1098, 1103 (9th Cir. 2003)

20  (claim for benefits "deemed denied" based on the administrator's failure to render a decision in a

21  matter consistent with the procedural requirements set forth in the plan).

22      Venue is proper in the Northern District of California under 29 U.S.C. § 1132(e)(2) because

23  the Plan is administered in this District and the alleged wrongful conduct took place in this District.

24  Venue is also proper under 28 U.S.C. § 1391(b) because a substantial number of the events or

25  omissions giving rise to Biba's claims occurred within this District.

26  ///

Page 8 of  29

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

**B.      Standard of Review**

A challenge to a denial of benefits allegedly owed under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Likewise, a *de novo* standard is appropriate where a claim for benefits is "deemed denied" based on the administrator's failure to render a decision in a matter consistent with procedural requirements set forth in the plam.  *Jebian v. Hewlett-Packard Co.*, 349 F.3d 1098, 1103 (9th Cir. 2003).

Summary judgment is proper when the pleadings, discovery, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, discovery and affidavits that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Liberty Lobby*, 477 U.S. at 248.  When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on unsupported conclusory allegations to create an issue of material fact.  *United States v. 1 Parcel of Real Property*, 904 F.2d 487, 492 n.3 (9th Cir. 1990) (citing *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978).  However, the opposing party need not produce evidence in a form that would be admissible at trial in order to avoid a summary judgment.  *Celotex*, 477 U.S. at 324.  Nor must the

1  opposing party show that the issue will be resolved conclusively in its favor.  *Liberty Lobby*, 477

2  U.S. at 248-49.  All that is necessary is sufficient evidence supporting the asserted factual dispute

3  and requiring a jury or judge to resolve the parties' differing versions of the truth at trial.  *Id.*

4         The court's function on a summary judgment motion is not to make credibility

5  determinations or weigh conflicting evidence with respect to a disputed material fact.  *T.W. Elec.*

6  *Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Rather, the evidence

7  and inferences to be drawn from the facts must be viewed in the light most favorable to the

8  nonmoving party.  *Id.* at 631.  However, in determining whether to grant or deny summary

9  judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact."

10 *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1966).  Rather, a court is entitled to rely on the

11 nonmoving party to identify with reasonable particularity the evidence that precludes summary

12 judgment.  *Id.*

13 **C.**     **Application to the Case at Bar**

14        1.     29 U.S.C. § 1132(a)(1)(B) Claim

15        In her first ERISA claim for relief, Biba is seeking to recover severance benefits allegedly

16 owed to her under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B).  Because the Plan administrator

17 failed to address Biba's benefits claim all together, let alone in a manner consistent with the Plan

18 requirements, Biba's ERISA claims are entitled to a *de novo* review by this Court.  To be eligible

19 for benefits under 29 U.S.C. § 1132(a)(1)(B), Biba has the burden of showing that: (1) the Plan is

20 covered by ERISA, (2) Biba is a participant or beneficiary of the Plan, and (3) Biba was wrongfully

21 denied severance pay owed under the Plan.  *Burrey v. Pacific Gas and Elec. Co.*, 159 F.3d 388, 392

22 (9th Cir. 1998).  It is undisputed that the Plan is covered by ERISA and that Biba was, at all

23 relevant times, a Plan participant.  (JSF ¶6, Dkt. #24.)  Thus, the only material question remaining

24 is whether Biba was wrongfully denied severance benefits owed to her under the terms of the

25 ERISA Plan.

26        Section 4.1 of the Plan provides that "an employee . . . shall be eligible for a Base Benefit if:

27

28                                              Page 10 of  29

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

(a) Subject to Sections 4.2 and 4.3, the Employee's employment is terminated as a result of a Change in Control (or constructively terminated by not being provided a Comparable Position (as defined in Section 4.3)) within one (1) year . . . of the Change in Control . . . ; and (b) The Employee's employment is not terminated for Cause . . . ."  (JSF, Ex. 1, Dkt. #24.)  Section 4.2(b) of the Plan provides that an employee shall not be entitled to benefits if "[t]he employee is *provided* a Comparable Position . . . by the successor employer or by a Member Company, regardless of whether the Employee accepts the *offer . . .*" *Id.* (emphasis added).  Under Section 4.2, an employee who is terminated for "cause" is also not entitled to receive severance benefits under the Plan. *Id.*  Defendants contend that Biba was not wrongfully denied severance benefits under the Plan for two reasons: (1) WFC *provided* Biba a comparable position; and (2) WFC terminated Biba for cause.  (Defs.' Mot. 10:3-7, Dkt. #23.)  Biba asserts that she is entitled to severance benefits under the Plan because: (1) WFC never *offered* her a comparable position; or (2) alternatively, assuming that WFC did offer her a position, it wasn't comparable under the Plan; and (3) WFC constructively terminated her before she was purportedly terminated for cause.  (Pl.'s Opp'n. 13:17-20, Dkt. #34.)

At the outset, the Court must first address the parties' competing interpretations of Section 4.2(b) of the Plan.  In a claim for severance benefits allegedly owed under an employee benefits plan covered by ERISA, the terms the plan shall be interpreted "in an ordinary and popular sense as would a person of average intelligence and experience."  *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997) (citing *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990) (citation omitted)).  "Courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties."  *Id.* (quoting *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991) (citations omitted)).  However, if the plan is ambiguous, the court may examine extrinsic evidence to determine the intent of the parties. *Richardson*, 112 F.3d at 985 (citing *Taylor v. Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232-33, 1236 (3d Cir. 1991)).

Page 11 of  29

United States District Court

For the Northern District of California

1      The conflict here turns on whether the Plan required WFC to make an affirmative

2   employment offer or simply make a comparable position available to Biba after the Acquisition

3   took place.  In her opposition, Biba focuses on the term "offer," arguing that Section 4.2(b) required

4   WFC to make an overt or formal employment offer.  (Pl.'s Opp'n. 13:22-27, Dkt. #34.)  Meanwhile,

5   Defendants focus on the term "provide," arguing that the Plan does not compel the acquiring

6   company to make a formal employment offer, so long as a comparable position was made available

7   to the employee.  (Defs.' Reply 2:20-21, Dkt. #64.)  This is a fine distinction indeed, and looking to

8   the explicit language of the Plan, the clear intention of the Plan's drafters is not immediately

9   apparent.  In the employment context, the use of the term "provide" suggests that a comparable

10   position need only be made available to a Plan participant, whereas the term "offer," in contrast,

11   connotes the existence of a formal and affirmative employment offer comparable in nature to

12   contractual principles of offer and acceptance.  However, as they are used in this context, the terms

13   "provide" and "offer" are used interchangeably; with "offer" being used later in the same sentence

14   to qualify to the term "provide."  This construction creates a patent, albeit slight, ambiguity making

15   it difficult to discern which of the two was intended to be the operative term.  Due to this

16   ambiguity, the Court is permitted to consider extrinsic evidence to assist in interpreting the meaning

17   of Section 4.2 of the Plan.  *Richardson*, 112 F.3d at 985.

18      In support of their interpretation, Defendants point to evidence that WFC provided

19   transition materials to GBB employees as part of the Acquisition, which provide that "[b]ecause

20   this is a stock acquisition, employees do not receive *offers* of employment as all employment is

21   considered continuous."  (Defs.' Reply 2:23-26, Dkt. #64; Stream Decl. Ex. 1, Dkt. #26.)  This is

22   the only evidence provided by either party relating to the interpretation of Section 4.2 of the Plan.

23   When considering this evidence in conjunction with the plain language of the Plan, it becomes

24   apparent that Defendants' construction of Section 4.2(b) is consistent with the Plan drafters'

25   intention.  Because Biba has provided no additional evidence to support her alternative construction

26   of Section 4.2(b), the Court is inclined to accept Defendants' interpretation.  Accordingly, this Court

27   finds that, under the specific circumstances surrounding this case, Section 4.2(b) does not require

28

1    WFC to make an affirmative employment offer to Biba.  Instead, the requirements of Section 4.2(b)

2    are satisfied if a comparable position was made available to Biba after the Acquisition took place

3    and Biba was aware of that opportunity.

4         However, this does not end the Court's inquiry into this matter.  The Court must still

5    determine if any genuine issues of material fact exist as to whether WFC provided Biba with a

6    comparable position after the Acquisition.  Pursuant to Section 4.3 of the Plan, a "comparable

7    position" is one that provides a base salary of at least one hundred percent of the base salary of the

8    position held by the employee immediately prior to the Acquisition and is based at a principle place

9    of employment that would not increase the employee's one-way commute by more than thirty five

10   miles.  (JSF, Ex. 1. Dkt. #24.)

11        As proof that WFC made a comparable position of employment available to Biba,

12   Defendants point to evidence showing that as early as the July 2007 introductory meeting, Biba,

13   along with each of the other members of GBB's SAD, was "mapped" to continue working at WFC's

14   CMG after the Acquisition.  (Isom Decl., Ex. 4 (Mebane Depo. 26:4-11), Dkt. #25; Isom Decl. Ex.

15   6 (Creed Depo. 14:6-10), Dkt. # 25.)  The record also shows that around the time of this meeting,

16   Biba communicated to WFC that she was not interested in a position in the CMG because she

17   believed she was overqualified for the position, but that she was interested in working for WFC in

18   some other capacity.  (Isom Decl., Ex. 1 (Biba Depo. 43:6-21), Dkt. # 25; Isom Decl., Ex. 4

19   (Mebane Depo. 36:19-20), Dkt. #25.)  Accordingly, Biba undertook efforts to find a different

20   position within WFC, but those efforts proved unsuccessful.  (PF ¶21, Dkt. #63.)  In addition, WFC

21   sent a letter to Biba on November 1, 2007, which identified the Loan Adjustment Manager

22   ("LAM") 3 position as the position available to Biba at an annual salary of $148,525.20; an amount

23   obviously less than her pre-acquisition salary of $152,980.08 plus a $750/month auto allowance.

24   (JSF, Ex. 2, Dkt. #24.)  This same information was once again conveyed to Biba in a second letter

25   sent by WFC to Biba on November 8, 2007, which "confirmed" the position of LAM 3 as the

26   position available to Biba.  (JSF, Ex.3, Dkt. #24.)  Although it is not entirely clear from the record

27   what her formal job title was, it is certainly evident that Biba continued working for WFC through

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   the legal close of the Acquisition on October 7, 2007 until her employment was terminated for

2   Cause effective February 13, 2008.  (JSF ¶29, Dkt. #24.)

3            The Court must also determine if the position WFC provided to Biba was comparable under

4   the terms of the Plan.  Biba argues that even assuming that WFC did provide her with a position

5   after the Acquisition, the position was not comparable because it did not satisfy the salary and

6   location requirements set forth in Section 4.3 of the Plan.  (Pl.'s Opp'n. 14:22-15:2, Dkt. #34.)  In

7   support of her argument, Biba points to the November 1, 2007 letter, which identified the Loan

8   Adjustment Manager ("LAM") 3 position as the position available to Biba at an annual salary of

9   $148,525.20; an amount obviously less than her pre-acquisition salary of $152,980.08 plus a

10  $750/month auto allowance.  (Pl.'s Opp'n. 13:22-25, Dkt. #34.)  Biba also points out that the

11  maximum salary at the time for the LAM 3 position was $149,500.  (PF ¶146, Dkt. #63.)  Similarly,

12  Biba points out that the November 8 letter "confirmed" the position of LAM 3, but subsequently

13  referred to the Loan Adjustor 4 position, which has an even lower pay scale.  (Pl.'s Opp'n. 14:5-7,

14  Dkt. #34.)  Defendants acknowledge these discrepancies, but maintain that the salary and job title

15  information reflected in the letters were merely a typos, and point out that her payroll records

16  indicate that Biba was working at the same location, earning at least as much as she did prior to the

17  Acquisition until she was terminated for Cause on February 12, 2008.[2]  (Defs.' Reply 4:12-15, Dkt.

18  #64.)

19           Even viewing the submitted evidence in a light most favorable to Biba, the Court finds that

20  WFC did, in fact, provide Biba with a comparable position.  Notwithstanding the underlying

21  confusion about Biba's job title, the submitted evidence clearly demonstrates that Biba was fully

22  aware that a position was available to her in the CMG should she choose to accept it.  This dispute

23  arose because Biba was dissatisfied with the position available to her in the CMG and chose not to

24  accept a position therein.  However, Biba's dissatisfaction with the position available to her is

25  immaterial under the relevant sections of the Plan, which provide that an employee who is provided

26

27           [2]A detailed account of Biba's February 12, 2008 termination for Cause is discussed *infra*.

28                                        Page 14 of  29

United States District Court

For the Northern District of California

1    a comparable position is not entitled to severance benefits "regardless of whether she accepts the

2    position." (JSF, Ex. 1, Sec. 4.2(b), Dkt. #24.) Biba cannot create a triable issue of fact by pointing

3    to a single written correspondence that reflects incorrect salary information when the evidence

4    clearly shows that Biba continued to work at the same location earning at least the same base salary

5    she was earning immediately prior to the Acquisition.

6          The Court finds that Biba was not wrongfully denied severance benefits under the Plan

7    because WFC provided her with a comparable position after the Acquisition legally closed.[3]

8    Accordingly, Defendants are entitled to summary judgment as a matter of law as to the first cause

9    of action in Biba's complaint.

10                    2.    29 U.S.C. § 1132(a)(3) Claim

11         In her second ERISA claim for relief, Biba contends that WFC is equitably estopped from

12   denying benefits under 29 U.S.C. § 1132(a)(3), based upon representations made regarding Biba's

13   entitlement to those benefits. (Pl.'s Opp'n. 16:7-8, Dkt. #34.) Biba argues that she is entitled to full

14   benefits under the Plan based upon her reliance on WFC's oral promises that she would have the

15   option to elect to receive severance benefits instead of accepting a position with WFC. *Id.* at 16:8-

16   11. Defendants move for summary judgment on Biba's equitable estoppel claim, arguing that Biba

17   has failed to satisfy all of the required elements of this claim. (Defs.' Mot. 13:5-6, Dkt. #23.)

18         29 U.S.C. § 1132(a)(3) provides that a civil action may be brought by a plan participant to

19   obtain equitable relief to redress ERISA violations, or to enforce any applicable provisions of

20   ERISA or the terms of the plan. Although the Ninth Circuit recognizes that equitable estoppel can

21   be applied to ERISA claims in certain circumstances, its availability is severely restricted. *Greany*

22   *v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821-22 (9th Cir. 1992); *see also Kaiser*

23   *Permanente Employees Pension Plan v. Bertozzi*, 849 F. Supp. 692, 697 (N.D. Cal. 1994). To

24   succeed on a 29 U.S.C. § 1132(a)(3) equitable estoppel claim in the Ninth Circuit, an ERISA

25   beneficiary must prove that: (1) a material misrepresentation was made by a plan representative; (2)

26   ───────────────

27         [3]Similarly, because WFC provided Biba with a comparable position, Biba's argument that she was constructively terminated prior to being terminated for cause fails as matter of law. *See infra.*

28                              Page 15 of  29

the beneficiary reasonably and detrimentally relied on the misrepresentation; (3) the

misrepresentations were made under extraordinary circumstances; (4) the relevant provisions of the

Plan are ambiguous; and (5) the representations involved an oral representation of the plan. *Spink

v. Lockheed* Corp., 125 F.3d 1257, 1261 (9th Cir. 1997) (citing to *Pisciotta v. Teledyne Industries,

Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996)).  For purposes of this motion, Defendants concede that

material misrepresentations were made to Biba regarding an oral interpretation of the Plan.  (Defs.'

Mot. 13:19-20, Dkt. #23.)  Thus, the only questions that remain are: (1) whether Biba reasonably

relied to her detriment on the misrepresentations; (2) whether Biba can prove the existence of

extraordinary circumstances; and (3) whether the relevant provisions of the plan are ambiguous.

(Defs.' Mot. 13-16, Dkt. #23.)

> a.      *Reasonable and Detrimental Reliance*

In an equitable estoppel claim brought under 29 U.S.C. § 1132(a)(3), the plaintiff has the

burden of proving that she reasonably relied to her detriment on the material misrepresentation.

*Spink*, 125 F.3d at 1261.  To establish reasonable reliance, Biba must, at minimum, prove that she

was "ignorant" of the true facts relevant to her claim for benefits.  *Ellenberg*, 763 F.2d at 1096; *see

also Jordt v. Clerks*, 2006 WL 228953, at *8 (N.D. Cal. Jan. 30, 2006).  Biba has not established

that she was ignorant to the true facts relevant to her claim for benefits.  In fact, Biba ignores this

requirement all together and focuses solely on the detrimental reliance requirement.

Defendants concede that on at least two separate occasions prior to the Merger, Fracchia

represented to Ken Shannon and other WFC executives that WFC would not offer positions to GBB

employees who did not want to work for WFC after the Merger.  (Defs.' Mot. 13:19-20, Dkt. #23.)

Consequently, "[b]y not offering positions to the GBB employees, eligible employees such as

Pierce and Biba would be able to receive benefits under the Plan."  (Pl.'s Opp'n. 4:27-28, Dkt. #34.)

Shannon subsequently represented this same information to his staff, including Biba.  *Id.*  These

representations are clearly inconsistent with the express terms of the Plan, which states that Biba

would not be entitled to severance benefits under the Plan if WFC provided her with a comparable

position, regardless of whether or not she accepted the position.  (JSF, Ex. 1, Sec. 4.2(b), Dkt. #24.)

Although Biba was likely unaware of this inconsistency when she first learned of the misrepresentation, the submitted evidence demonstrates that Biba was, indeed, apprised of the true facts well in advance of the legal close of the Acquisition in October 2007.  For example, Biba attempted to "clarify" her entitlement to severance benefits with WFC several times because she "knew" that Fracchia's promise was not consistent with the language of the Plan.  (Lewis Decl., Ex. 1 (Biba Depo. 71:9-19, 98:1-22, 117:15-19, 120:1-6), Dkt. #37.)  In the November 8, 2007 letter, WFC employee Kathy Kroll clearly and unambiguously stated that "the Change in Control Plan does not give you the flexibility to decide whether you want to continue your employment . . . or terminate your employment and receive Change in Control Plan severance pay and benefits."  (JSF, Ex. 3, Dkt. #24.)  This same information was again conveyed to Biba in December 2007 by Pierce, who informed Biba that WFC "would not make severance available to anyone who did not want a job with WFC."  (PF ¶68, Dkt. #63.)  Because Biba became aware that the oral misrepresentations were clearly inconsistent with the language of the Plan prior to the Acquisition, the Court finds that Biba's alleged reliance on the promise after the Acquisition cannot be characterized as reasonable.

Even if Biba was able to prove that her reliance on the oral misrepresentations was reasonable, she has nevertheless failed to establish that such reliance was detrimental.  For there to be detrimental reliance, Biba must prove that she made a decision in reliance on the alleged misrepresentation that resulted in some detriment to her.  *Bopp v. Idaho Nat'l Lab. Empl. Ret. Plan*, 709 F.Supp.2d 1024, 1032 (D. Idaho 2010).  Biba alleges that the detrimental reliance requirement is satisfied because Fracchia's oral misrepresentations induced her to continue working for WFC through the Merger and to not pursue other employment opportunities.  (Pl.'s Mot. 18:9-11, Dkt. #34.)  However, merely refraining from seeking other employment is not considered "detrimental" reliance sufficient to overcome summary judgment in an equitable estoppel claim under ERISA.  *Skinner v. Northrop Grumman Ret. Plan B*, 2010 WL 679061, at *8 (C.D. Cal. Jan. 26, 2010) (finding that plaintiff's argument that detrimental reliance occurred because plaintiff remained employed longer than plaintiff otherwise would have is "plainly insufficient[]").  Under similar facts, courts have found detrimental reliance to exist only where the plaintiff was induced to

United States District Court

For the Northern District of California

voluntarily quit a current job or to reject another pending employment offer. *Piekarski v. Home Owners Sav. Bank, F.S.B.*, 956 F.2d 1484, 1494 (8th Cir. 1992) (no detrimental reliance found where the plaintiff "did not decline pending job offers or pass up a concrete opportunity to look for other jobs.").

Biba likens her situation to that of the plaintiff in *Enniss v. Enniss*, a Southern District of California case wherein the court found that the plaintiff had, indeed, demonstrated detrimental reliance. *See* 2004 WL 5416322 (S.D. Cal. 2004). However, Biba's reliance on *Enniss* is misplaced. In *Enniss*, the court found that the plaintiff had detrimentally relied on the defendant's promise to fund the plaintiff's retirement because that promise actually induced the plaintiff to quit his current job and give up his entitlement to a Union pension fund. *Id.* at *6. Biba's situation is easily distinguishable from the facts presented in *Enniss.* Unlike the plaintiff in *Enniss*, Biba simply remained employed longer than she may otherwise have been: she was not induced to quit her current job or to decline another pending job offer. In other words, Biba merely refrained from seeking other employment, which does not constitute detrimental reliance.

*b.*     *Extraordinary Circumstances*

To establish an equitable estoppel claim under 29 U.S.C. § 1132(a)(3), the plaintiff has the burden of proving "extraordinary circumstances."[4]  *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1142 (3d Cir. 1993). "Extraordinary circumstances" generally involve acts of bad faith on the part of the employer, attempts to conceal a significant change in an ERISA plan, or affirmative acts of fraud. *Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1011 (3d Cir. 1997). Extraordinary circumstances have been found where the plaintiff repeatedly and diligently inquired about benefits and the defendant repeatedly misrepresented the scope of coverage available to the plaintiff over an extended course of dealing. *Curcio v. John Hancock Mut. Life. Ins. Co.*, 33 F.3d 226, 238 (3d Cir. 1994). Additionally, a plaintiff's particular vulnerability may be a factor to consider when determining the existence of extraordinary circumstances. *Id.*

---

[4]The Ninth Circuit has adopted the Third Circuit's inclusion of an extraordinary circumstances element in ERISA equitable estoppel claims. *Enniss*, 2004 WL 5416322, at *4.

United States District Court

For the Northern District of California

1    Applying these principles to Biba's case, the Court finds that Biba has failed to establish the

2    presence of extraordinary circumstances.  First, Biba has not alleged that she is particularly

3    vulnerable or susceptible to lies or misrepresentations.  Second, even assuming that material oral

4    misrepresentations were made on several occasions, WFC employees subsequently corrected the

5    misinformation at least as early as the November 8, 2007 letter, which stated that the Plan "does not

6    give you the flexibility to decide whether you want to continue your employment performing the

7    job duties of a Comparable Position or terminate your employment and receive Change in Control

8    Plan severance pay and benefits."  (JSF, Ex. 3, Dkt. #24.)

9    Biba asserts that WFC acted with bad faith through "covert plans to eliminate her position

10   and trumped-up termination decision."  (Pl.'s Opp'n. 19:8-10, Dkt. #34.)  However, this position

11   enjoys no support in the record, and rests entirely on unfounded speculation and conjecture.  As

12   support for this claim, Biba points to a September 21, 2007 email sent by Creed to Mebane,

13   wherein Creed identifies Biba as one of the SAD employees to be  mapped to WFC's CMG, but

14   also states in parentheses that "Susan has told us she is not interest in CMG - we will need to fill

15   this as LA 2/3/4."  (Lewis Decl., Ex. 12, Dkt. #37.)  Biba also points to CMG organization charts,

16   prepared by Creed, which show that Biba's position was to be eliminated.  *Id.*  However, Biba's

17   characterization of these documents disregards the fact that every statement made regarding the

18   elimination of Biba's position was clearly conditioned on the understanding that Biba had, herself,

19   decided not to accept a position in the CMG.  Biba has provided absolutely no evidence to support

20   her claim of bad faith, and such "conclusory allegations of collusion, without factual support, are

21   insufficient to defeat summary judgment."  *National Steel Corp. v. Golden Eagle Ins. Co.*, 121 F.3d

22   496, 502 (9th Cir. 1997).

23    *c.    Whether the Plan is Ambiguous*

24   In claims brought under ERISA, equitable relief is only available if the relevant "provisions

25   of the plan at issue are ambiguous such that reasonable persons could disagree as to their meaning

26   or effect."  *Pisciotta*, 91 F.3d at 1331.  Even if the relevant provisions of the plan are ambiguous, a

27   plan participant is not entitled to rely on misrepresentations made by a plan employee if doing so

28

Page 19 of  29

1   would expand or enlarge the benefits provided by the express language of the plan itself.  *Bopp*, 709

2   F.Supp.2d at 1032 (citing to *Greany*, 973 F.2d at 822); *see also Rodrigue v. Western and S. Life Ins.*

3   *Co.*, 948 F.2d 969, 971 (5th Cir. 1991) (noting that "ERISA's writing requirement protects the

4   plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to

5   persons not entitled to them under the express terms of the plan").

6           Biba cites to two amendments to the original Plan, arguing that at as a result of these

7   amendments "[i]t is impossible to know which Plan was operative at the time of the statements

8   made to Biba upon which she relied."  (Pl.'s Opp'n. 21:3-4, Dkt. #34.)   First, Biba points out that

9   under Section 4.2(b) of the original Plan, to be eligible for benefits one must not have been offered

10  a "position of comparable pay and status[,]" defined as a position with: 1) at least one hundred

11  percent of the pay, bonus opportunity, and benefits; 2) a similar scope of duties and responsibilities;

12  and 3) one that does not require the employee to increase his one-way commute by 35 miles.  *Id.* at

13  7-14; Pl.'s Compl. Ex. 1.)  Section 4.2(b) was subsequently amended on June 19, 2007 to state that

14  one must not have been offered a "Comparable Position[,]" defined in Section 4.3 as a position that

15  provides a regular base pay of at least one hundred percent of the employee's base pay immediately

16  prior to the effective time of the Change in Control; and is based at a principal place of employment

17  that would not require the employee to increase his normal one-way commute by more than 35

18  miles.  (Pl.'s Opp'n. 21:15-22, Dkt. #34; Pl.'s Compl., Ex. B.)  Second, Biba points out that the June

19  19, 2007 amendments also modified Section 3.4 by expanding the definition of a "for cause"

20  termination to include an "[e]mployee's failure to comply with any material terms or conditions of

21  employment[.]" (Pl.'s Opp'n. 21:18-20, Dkt. #34; Pl.'s Compl., Ex. B.)

22          Biba then quickly suggests that "some of the Plan provisions arguably violate Section 7.1 of

23  the Plan, creating further ambiguity as to whether and to what extent Plan amendments were

24  effective."[5]  (Pl.'s Opp'n. 21:4-6, Dkt. #34.)  However, Biba has failed to offer any evidentiary or

25

26          [5] Section 7.1 of the Plan provides that "[the] Plan may be amended from time to time, or
    terminated at any time at the discretion of the Board of Directors by a written resolution adopted by a
27  majority of the Board of Directors, *provided*, *however*, that no amendment or termination shall adversely

28                                                    Page 20 of  29

1    legal support for this argument, and without such support, the Court is unwilling to entertain such a

2    blind assertion.  Moreover, there is nothing ambiguous about the specific provisions of the Plan

3    referred to by Biba.  Indeed, in each version of the Plan, the message of the relevant provisions is

4    clear and straightforward; if an employee is offered a comparable position with a successor

5    employer, as defined by section 4.3, that employee is not eligible to receive severance benefits

6    under the Plan regardless of whether the employee accepts the position or not.  None of the

7    amendments Biba cites modify the clear meaning of these provisions, nor do they affect the

8    substance of the alleged misrepresentations made to Biba.  Consequently, Biba has failed to

9    establish that the relevant provisions of the Plan are ambiguous.

10        Because Biba has failed to satisfy all of the elements of her equitable estoppel claim, the

11   Court finds that Defendants are entitled to summary judgment as a matter of law as to the second

12   cause of action of Biba's complaint.

13            3.    29 U.S.C. § 1140 Claim

14        In her third ERISA claim for relief, Biba alleges that WFC terminated her employment to

15   avoid paying Biba severance benefits owed under the Plan in violation of 29 U.S.C. § 1140.  (Pl.'s

16   Compl. ¶44.)  Defendants move for summary judgment as to this claim, arguing that: 1) Biba has

17   failed to establish a *prima facie* case of discrimination; and 2) even if she had, Biba has failed to

18   carry her burden of showing that WFC's purported reasons for terminating Biba's employment were

19   a pretext for discrimination.  (Defs.' Mot. 18:15-16, 19:18-19, Dkt. #23.)

20        Under 29 U.S.C. § 1140, an employer is prohibited from taking an adverse action against an

21   employee because the employee has asserted a right to benefits under an ERISA plan.  *See Kimbro*

22   *v. Atlantic Richfield Co.*, 889 F.2d 869, 880 (9th Cir. 1989), *cert. denied* 498 U.S. 814 (1990).  The

23   Ninth Circuit "[has] adopted the *McDonnell Douglas* burden-shifting framework for assessing an

24   employer's liability for discriminatory interference with a plaintiff's exercise of protected rights

25   under section [1140]."  *Lessard v. Applied Risk Management*, 307 F.3d 1020, 1025 (9th Cir. 2002)

26

27   affect the right of a Participant to receive a severance benefit that the Participant has accrued on account
     of his termination of employment as a result of a Change in Control."  (JSF, Ex. 1, Dkt. #24.)

28                                   Page 21 of  29

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

(citing *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 457 (9th Cir. 1995)).  Under this framework, a plaintiff must first make out a *prima facie* case of discrimination.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* at 255.  If the defendant can articulate a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff to then demonstrate that the defendant's proffered reason is a mere pretext for discrimination.  *See id.* at 253.

To establish a *prima facie* case of discrimination, Biba must establish that she: 1) belonged to a protected group; 2) was qualified for the position; and 3) was discharged or denied employment under circumstances that give rise to an inference of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  It is undisputed that Biba has satisfied the first two prongs of this scheme.  Defendants do, however, maintain that Biba has failed to create a triable issue of fact that she was terminated under circumstances giving rise to an inference of discrimination because she has not offered any evidence that WFC acted with a "specific intent" to violate 29 U.S.C. § 1140. (Defs.' Reply 12:1-3, Dkt. #64.)

To support her claim that she was terminated under circumstances that give rise to an inference of discrimination, Biba offers no direct evidence that WFC acted with a specific intent to interfere with her rights under section 1140.  Instead, Biba relies entirely on the assertion that "she had been promised benefits under the Plan for working through the Merger."  (Pl.'s Opp'n. 23:5-6, Dkt. #34.)  Although "[t]he nature of the plaintiff's burden of proof at the *prima facie* stage is *de minimus*[,]" *Dister*, 859 F.2d at 1114; an inference of discrimination "may not be created by mere subjective belief or debatable assertions."  *Little v. Cox's Supermarkets*, 71 F.3d 637, 643 (7th Cir. 1995).  Biba offers no additional evidence to substantiate her claim, yet she prematurely proceeds with her argument as though her *prima facie* case for discrimination is a foregone conclusion.  This is insufficient to establish a *prima facie* case of discrimination.

Even though Biba has failed to establish a *prima facie* case of discrimination, the Court will proceed with the remaining analysis under the *McDonell Douglas* framework.  Under this

United States District Court

For the Northern District of California

1    framework, Defendants must be able to articulate a legitimate non-discriminatory reason for

2    terminating Biba's employment. *Burdine*, 450 U.S. at 255.  Defendants' stated reason for

3    terminating Biba's employment is based on her failure to complete a number of employment related

4    forms, which were defined as material conditions of employment under the Plan.  (JSF ¶29, Dkt.

5    #24.)  Defendants allege that Tassio, a GBB employee, became aware that Biba had not completed

6    the requisite Background Authorization Check Forms and I-9 Form in or around the middle of

7    December 2007.  (Defs.' Mot. 6:18-20, Dkt. #23.)  Soon after making this discovery, Tassio made

8    two phone calls to Biba requesting that she complete these forms, as they are a material condition

9    of employment with WFC.  (Isom Decl., Ex. 5, (Tassio Depo.) 47:19-48:8, Dkt. #25.)  On January

10   24, 2008, Stream, a WFC Human Resources Consultant, sent Biba a memorandum notifying her

11   that WFC was placing Biba on administrative leave until January 28, 2008 pending her completion

12   of the Background Authorization Form.[6]  (*Id.* at 7:10-13.)  On January 28, 2008, Biba faxed Stream

13   a signed authorization form that included a number of "conditions."  (JSF ¶20, Ex. 4, Dkt. #24.)  On

14   January 29, 2008, Stream informed Biba through email that WFC could not accept the conditions

15   attached to the Form and gave Biba until the following day to produce the authorization.  *Id.* at ¶22,

16   Ex. 4.  In a letter to Stream, Biba explained that she was "concerned" with signing the authorization

17   because it appeared to be "very broad and far-reaching in its scope[]" and she had been the victim

18   of identity theft.  *Id.* at ¶21.  Biba signed the authorization without conditions but "under protest" on

19   January 30, 2008.  *Id.* at ¶23.

20         On February 1, 2008, WFC discovered that the background check could not be completed

21   because Biba's social security number was "frozen."  (JSF ¶24, Ex. 7, Dkt. #24.)  Stream contacted

22   Biba several times over the next few days requesting that Biba unfreeze her account to allow WFC

23   to conduct its background check.  *Id.* at ¶¶25, 26, Ex. 8.  On February 5, 2008, Biba made a

24   harassment complaint against Stream related to Stream's communications with Biba regarding the

25   completion of the employment forms.  *Id.* at ¶30, Ex. 11.  On February 7, 2008, Biba notified

26   _____

27         [6] On that same day a security freeze was placed on Biba's credit report at Biba's request.  (JSF
     ¶24, Dkt. #24; Isom Decl., Ex. 10, Dkt. #25.)

28                              Page 23 of  29

1   Stream that the freeze on her account had been temporarily lifted for three days. *Id.* at ¶27, Ex. 9.

2   WFC again attempted to conduct the background check a number of times over the next four days

3   but were unable to do so because Biba's account remained frozen. (Isom Decl., Ex. 2, 139:11-16,

4   Dkt. #25.)  On February 12, 2008 — over two weeks after the initial deadline for completing the

5   background authorization and months after WFC first requested she complete the forms — Mebane

6   sent Biba a letter terminating Biba's employment with WFC.  (JSF ¶29.)  In the letter, WFC stated

7   its reasons for terminating Biba's employment as difficulties faced in obtaining the requisite

8   background authorization forms and the incomplete I-9 Form.  (JSF ¶29, Dkt. #24.)

9        Because Defendants have successfully articulated a legitimate, non-discriminatory reason

10  for terminating Biba, the burden shifts back to Biba to establish that Defendants' stated reason was

11  pretextual and that her employment was actually terminated "because of a specific intent to

12  interfere with [her] ERISA rights." *Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th

13  Cir. 1990).  "[N]o action lies, where the alleged loss of rights is a mere consequence as opposed to a

14  motivating factor behind the termination." *Id.* (citing *Kimbro*, 889 F.2d at at 881).  A plaintiff can

15  show pretext by demonstrating that the employer's stated reason is "unworthy of credence."

16  *Burdine*, 450 U.S. at 256.  Moreover, where the defendants' stated reason for the termination is the

17  plaintiff's violation of a workplace rule, the plaintiff must present evidence that "[s]he did not

18  violate the rule or that, if she did, the defendant[s] selectively enforced the rule in a discriminatory

19  manner." *Williams v. Agilent Techs.*, 2004 WL 2780811 at *4 (N.D. Cal. December 3, 2004)

20  (citing *Fong v. American Airlines, Inc.*, 626 F.2d 759, 762 (9th Cir. 1980) (holding, in Title VII

21  race discrimination case, where plaintiff conceded violation of workplace rule against theft and

22  offered no evidence that the rule was not enforced against similarly situated persons of races other

23  than that of plaintiff, plaintiff failed to demonstrate *prima facie* case).

24       Courts must take great care when determining if summary judgment is appropriate where

25  issues of motivation and intent are involved, as these issues inevitably present evidentiary

26  difficulties. *Dytrt*, 921 F.2d at 896.  However, "a party against whom summary judgment is sought

27  is not entitled to a trial simply because he has asserted a cause of action to which state of mind is a

28

**United States District Court**
For the Northern District of California

Page 24 of  29

United States District Court

For the Northern District of California

material element."  *Id.*  To survive summary judgment, Biba must do more than merely challenge the judgment of WFC through the lens of her own self-interested assertions.  *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986).  "There must be some indication that [s]he can produce the requisite quantum of evidence to enable [her] to reach the jury with [her] claim."  *Dytryt*, 921 F.2d at 896 (quoting *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975), *cert. denied*, 425 U.S. 904 (1976).

Not surprisingly, Biba relies entirely on circumstantial evidence and timing to support her claim of pretext.  Biba alleges that WFC's reliance on Biba's failure to complete the I-9 Form and the difficulties WFC encountered in obtaining the background authorization form as the reason behind the termination are "unworthy of credence[.]"  (Pl.'s Opp'n. 23:14-19, Dkt. #34.)  First, Biba points to what she refers to as "Creed's plans to eliminate Biba's position[.]"  *Id.*  However, characterizing Creed's conduct as such is misleading and unsupported by the evidence.  The email and corresponding documentation from which Biba draws this inference do nothing to suggest that Creed was developing a covert plan to eliminate Biba's position, as Biba suggests.  (Lewis Decl., Ex. 12, 13, Dkt. # 37.)  Rather, this evidence shows that at the time of the email, WFC was uncertain as to exactly how GBB employees would fit into the new WFC scheme, but that Biba had communicated that she was not interested in taking a position with the CMG.  *Id.*  Any claim to the contrary, without more support, is nothing more than a unfounded conclusory assertion.  Second, Biba offers no justification for how her earlier meeting with Fracchia regarding his misrepresentations is related to her subsequent termination.  Defendants do not dispute that Fracchia had been "verbally abusive and physically confrontational" in the meeting and communicated that WFC would not honor his earlier promise.  (PF, ¶74, Dkt. #63.)  However, notwithstanding Fracchia's abrupt reaction, the result of that discussion was ultimately that Biba learned from the original source of the misrepresentations that Fracchia's earlier promise would not be honored.  Finally, it is unclear how Biba's request for medical leave in early February would affect her section 1140 claim and Biba offers no explanation as to how this event is relevant to her argument of pretext under ERISA.  Additionally, Biba fails to rebut, or even address, Defendants'

assertion that at the time of Biba's termination, WFC had already taken the position that Biba was no longer entitled to severance benefits under the Plan because she had continued working with WFC through the Merger.  (Defs.' Reply 12:9-12, Dkt. #64.)

Additionally, Biba argues that it was improper for WFC to base its termination decision on her failure to complete the I-9 Form without giving her the opportunity to do so before effectuating the termination.  (Pl.'s Opp'n. 23:16-17, Dkt. #34.)  However, contrary to Biba's assertion, WFC's stated reason for the termination involves both Biba's failure to complete the I-9 Form and WFC's inability to complete Biba's background check as a result of the account freezes put in place by her. (JSF ¶29, Dkt. #24.)  Admittedly, had WFC relied entirely on the incomplete I-9 form, Biba's argument might be more tenable.  But that is not the case here.  The evidence shows that not only was the I-9 Form never completed, the background check was never fully completed despite considerable efforts on the part of WFC, even though Biba did eventually sign the background check authorization form.  (Isom Decl., Ex. 2, 139:11-16, Dkt. #25.)  Thus, the evidence presented by Biba is insufficient to establish that WFC's "proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

Accordingly, the Court finds that Defendants are entitled to summary judgment as a matter of law because Biba has failed to establish that WFC terminated her in retaliation for exercising an ERISA right or to prevent attainment of benefits to which she would have become entitled under the Plan.

### 4.    29 U.S.C. § 2615(a)(1) FMLA Claim

In her fifth claim for relief, Biba alleges that WFC's termination of her employment constituted an unlawful interference with Biba's right to take FMLA-protected medical leave in violation of 29 U.S.C. § 2615(a)(1).  (Pl.'s Compl. ¶50.)  The FMLA provides that an eligible employee shall be entitled to twelve workweeks of leave during any twelve-month period due to the birth of a child, adoption, to care for the spouse, son, daughter, or parent of the employee, or because of a serious health condition that makes the employee unable to perform the function of his or her position.  29 U.S.C. § 2612.  Pursuant to 29 U.S.C. § 2615(a)(1), it is unlawful for an

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right

2    provided" by the Act.[7]  The controlling regulations plainly prohibit employers from considering an

3    employee's use of FMLA-protected leave in making adverse employment decisions: "employers

4    cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring,

5    promotions or disciplinary actions . . . ." 29 C.F.R. 825.220(c).[8]  Accordingly, to prevail on her

6    claim, Biba must show by a preponderance of the evidence that: 1) she attempted to take FMLA-

7    protected leave, and 2) her attempt to take FMLA-protected leave constituted a negative factor in

8    WFC's decision to terminate her employment. *Bachelder,* 259 F.3d at 1124.[9]  Biba can prove this

9    _____

10    [7]The FMLA recognizes two separate claims for violations of its provisions: 1) interference
      claims, in which employers burden or outright deny substantive statutory rights to which an employee
11    is entitled under 29 U.S.C. § 2615(a)(1); and retaliation claims, in which employers discharge
      employees for exercising their FMLA right to leave under 29 U.S.C. § 2615(a)(2).  *Bachelder v.*
12    *American West Airlines Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001).  In the Ninth Circuit, claims alleging
      that an employer took adverse employment actions against an employee for taking or asserting a right
13    to take FMLA leave are treated as section 2615(a)(1) "interference claims, rather than section 2615(a)(2)
      discrimination claims.  *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133,  fn 7 (9th Cir. 2003) (citing
14    *Bachelder,* 259 F.3d at 1124).

15    [8]  Congress delegated authority to the Department of Labor to promulgate regulations
      implementing the FMLA. 29 U.S.C. § 2654.  As explained by the Ninth Circuit:
16
17        [T]he particular provision of the regulations prohibiting the use of FMLA-protected
          leave as a negative factor in employment decisions, 29 C.F.R. 825.220(c), refers to
18        "discrimination," but actually pertains to the "interference with the exercise of rights"
          section of the statute, § 2615(a)(1), not the anti-retaliation or anti-discrimination
19        sections, §§ 2615(a)(2) and (b).  While the unfortunate intermixing of the two different
          statutory concepts is confusing, there is no doubt that 29 C.F.R. 825.220(c) serves, at
20        least in part, to implement the interference with the exercise of rights section of the
          statute.  29 C.F.R. 825.220(b) ("Any violations of the Act or of these regulations
21        constitute interfering with, restraining, or denying the exercise of rights provided by the
          Act.").

22    *Bachelder,* 259 F.3d at 1124-25.

23    [9]  Notably, neither party has identified the proper standard of review employed in the Ninth
      Circuit.  Instead, both parties apply the Eleventh Circuit approach, which states that to succeed in her
24    FMLA claim, Biba must prove: (1) entitlement to the FMLA right claimed; (2) the employer's
      interference with or denial of that right; and (3) that there is a causal connection between the
25    interference and the harm. *Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001).  In
      fairness, the two different rule statements set forth essentially the same requirements for establishing
26    an FMLA interference claim, as the phrases "causal connection" and "negative factor" are virtually
      indistinguishable under these circumstances.  "[R]equiring a showing that the protected activity
27    constituted a negative factor in an adverse employment decision is another way of stating that there must

28                                  Page 27 of  29

**United States District Court**

For the Northern District of California

1    claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence,

2    or both.  *See e.g., Lambert v. Ackerley*, 180 F.3d 997 (9th Cir. 1999) (*en banc*) (using both direct

3    and circumstantial evidence to prove prohibited act under the Fair Labor Standards Act).  Because

4    Biba will bear the burden of proof at trial, Defendants may prevail on their motion simply by

5    showing an absence of evidence that Biba's claim for FMLA-protected leave constituted a negative

6    factor in her termination.  *Celotex*, 477 U.S. at 325.

7         It is undisputed that Biba's termination constitutes an adverse employment action and that

8    Biba's claim for medical leave is protected under the FMLA.  Thus, the only question remaining is

9    whether Biba's claim for FMLA-protected medical in early February was a negative factor in

10   WFC's decision to terminate her employment.  Defendants maintain that WFC's decision to

11   terminate Biba's employment was based solely on the difficulties it encountered in obtaining the

12   background authorization form and Biba's failure to complete the I-9 Form, and had nothing at all

13   to do with Biba's claim for FMLA-protected leave.  (Defs.' Mot. 20:15-16, Dkt. #23.)  Defendants

14   argue further that Biba cannot establish a causal connection between her termination and her claim

15   for FMLA-protected leave because Creed and Mebane, who made the final termination decision,

16   were both unaware of Biba's FMLA claim.  (Defs.' Mot. 20:9-11, Dkt. #23.)  Biba has not

17   introduced any direct evidence to support the inference that her claim for FMLA-protected leave

18   was a negative factor in WFC's decision to terminate her employment, instead, relying entirely on

19   circumstantial evidence.

20        Biba's strongest evidence in support of her claim is the close temporal relationship between

21   her termination and her claim for FMLA-protected leave.  Biba was terminated on February 12,

22   2008, just over a week after her request for FMLA-protected leave and shortly before her leave was

23   to commence at the end of February.  (JSF ¶29, Dkt. #24.)  While a close temporal proximity

24   between a claim for FMLA-protected leave and an adverse employment action may support an

25

26   be some causal connection between the FMLA right and the employment decision." *Hambright v.*

27   *Potter*, 2007 WL 1101262, at *7 (D.Ariz. Apr. 12, 2007).  Accordingly, the Court will proceed as
     though they are synonymous.

28                                         Page 28 of  29

United States District Court

For the Northern District of California

1   inference of causation, *Xin Liu*, 347 F.3d at 1137, it should not be considered "without regard to its

2   factual setting." *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) (using temporal

3   proximity along with other factors to establish that plaintiff's protected free speech was a negative

4   factor in the defendant's decision to take adverse employment action).  While the evidence shows

5   that WFC employees Creed and Mebane were solely responsible for making the final decision to

6   terminate Biba's employment, it is undisputed that neither Mebane nor Creed were aware of Biba's

7   FMLA claim when they made the final termination decision.  Instead, to establish a causal

8   connection between her termination and her FMLA claim, Biba points out that in making the

9   termination decision, Creed relied exclusively on information provided by Stream, who was aware

10  of Biba's FMLA claim.  (Pl.'s Opp'n. 25:13-17, Dkt. #34.)  However, there is no evidence even

11  suggesting that the information Stream provided to Creed was shaded in any way by Biba's FMLA-

12  protected claim or that Stream's knowledge of Biba's claim had any impact on Creed's decision.

13          Because Creed and Mebane were solely responsible for the decision to terminate Biba's

14  employment and because they had no knowledge of Biba's FMLA claim, Defendants have

15  demonstrated that no genuine issue of material fact exists as to the causal connection between

16  Biba's claim for FMLA-protected leave and WFC's decision to terminate her employment.  Under

17  the circumstances, the fact that her termination occurred within one week of her request for leave is

18  simply insufficient to create a triable issue of fact.  Accordingly, the Court finds that Defendants are

19  entitled summary judgment as a matter of law as to Biba's fifth claim for relief.

## IV.  CONCLUSION

21          Based on the analysis above, the Court GRANTS Defendants' Motion for Summary

22  Judgment in its entirety.

23          **IT IS SO ORDERED.**

24

25  Dated: November 10, 2010                    _____

26                                              Maria-Elena James
                                                Chief United States Magistrate Judge

27

28                                      Page 29 of  29